ORIGINAL

Approved: _____
ANDREW C. ADAMS/SARAH MORTAZAVI/BENET J. KEARNEY
Assistant United States Attorney

Before:  THE HONORABLE SARAH L. CAVE
         United States Magistrate Judge
         Southern District of New York

20MAG 2246

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA            :   **SEALED COMPLAINT**

            - v. -                  :   Violation of
                                        18 U.S.C. §§ 1956.
JOSE MORELY CHOCRON,                :
   a/k/a "Pepe,"                        COUNTY OF OFFENSE:
ISAAC SCHACHTEL,                    :   NEW YORK
JUAN CARLOS BALAGUERA VILLAMIZAR,
ALFREDO LICHOA, and                 :
JUAN MARCOS MATOS RUIZ,

            Defendants.             :

- - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        AARON J. OTTERSON, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNT ONE**
(Money Laundering Conspiracy)

        1.   From at least in or about May 2019, through in or about February 2020, in the Southern District of New York and elsewhere, JOSE MORELY CHOCRON, a/k/a "Pepe," ISAAC SCHACHTEL, JUAN CARLOS BALAGUERA VILLAMIZAR, ALFREDO LICHOA, and JUAN MARCOS MATOS RUIZ, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate the money laundering laws of the United States.

2. It was a part and an object of the conspiracy that JOSE MORELY CHOCRON, a/k/a "Pepe," ISAAC SCHACHTEL, JUAN CARLOS BALAGUERA VILLAMIZAR, ALFREDO LICHOA, and JUAN MARCOS MATOS RUIZ, the defendants, and others known and unknown, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, to wit, the purported proceeds of an offense against a foreign nation, namely bribery of a public official, including bribes purportedly intended to induce those officials to grant public contracts to the payors of those bribes, would and did conduct and attempt to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, to wit, the defendants agreed to launder, through various bank accounts and cash deliveries, the purported proceeds of bribes paid to Brazilian public officials, in violation of Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Sections 1956(h).)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

3. I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses and others, as well as my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4. From my conversations with other law enforcement agents, my review of reports and records, and my participation in this investigation, I have learned the following:

a. Since at least in or about May 2019, the FBI has been investigating a money laundering operation involving the transfer and receipt of United States currency and electronic funds in and through New York City and Miami, among other places. As described in more detail below, JOSE MORELY CHOCRON, a/k/a "Pepe," the defendant, throughout multiple interactions with two separate confidential sources ("CS-1" and

2

"CS-2," respectively) and an undercover agent (the "UC"), agreed to lend his money laundering and money transmission services to aid in the concealment of the funds represented to be the proceeds of foreign bribery. Following the FBI's initial interactions with CHOCRON, each of the other defendants, JOSE MORELY CHOCRON, a/k/a "Pepe," ISAAC SCHACHTEL, JUAN CARLOS BALAGUERA VILLAMIZAR, ALFREDO LICHOA, and JUAN MARCOS MATOS RUIZ, also agreed to, and did, accept and/or transfer funds in furtherance of the same scheme to launder purported proceeds of foreign bribery.

b. In or about January 2019, CS-1 informed law enforcement that CHOCRON and others working with and for CHOCRON were engaged in the laundering of what CS-1 understood to be narcotics proceeds and the proceeds of illegal gambling operations run by CHOCRON, using bank accounts in the United States, Panama, the Dominican Republic, and elsewhere.

c. Thereafter, and over the course of several months, CS-1 and CS-2 engaged in a series of recorded meetings with CHOCRON regarding CHOCRON's methods for receiving criminal proceeds and laundering those proceeds by, among other things, providing "clients" of his laundering service with an equivalent amount of money, in the form of cash or U.S. Dollar-denominated electronic wire transfers, that cannot be traced to the original source of the criminal proceeds. CHOCRON further discussed his willingness to engage in laundering transactions with CS-1 and CS-2 involving what CHOCRON understood to be the proceeds of corruption and graft by Brazilian public officials, as represented by CS-1 and CS-2 at the direction of law enforcement.[1]

d. For example, on or about May 10, 2019, CHOCRON, CS-1, and CS-2, during a recorded meeting in the Miami vicinity, engaged in the following conversation regarding the sources purported contacts in Brazil:

CS-2:   [Y]ou told me, for example, that sometimes you could put someone's money in at 15%. I also have an infrastructure. I have here a very good Brazilian organization.

---

[1] Meetings between the CS and CHOCRON are generally conducted in Spanish. Portions of conversations between CHOCRON, the CS, and the UC are excerpted from draft English-language translations of Spanish transcriptions of those meetings, prepared by Spanish language translators employed by the FBI.

JMC: Uh huh.

CS-2: And we have companies here and we have bank accounts here that can deal with big money, to move big amounts. What I do is, for example, I pick up money from--.

JMC: [OV] From people, from the ones you explained to me.

CS-2: -- from the Brazilian politicians.

JMC: [OV] Who don't know where to keep their money.

CS-2: They have all of it, all of it! But astronomical amounts, that one would say--

. . .

CS-2: So the man comes… they travel with diplomats, arrive here and they handle a million here, or there is a million there or $500,000.00 or $300,000.00.

JMC: Yes, whatever.

CS-2: Whatever. So, I take my time to make a deposit in the bank, because I have money in the bank, so what I do is that when he gives me one million I take out my commission, and I transfer his money which gets there within a day or two.

. . .

CS-2: It's all in cash.

JMC: All right, perfect.

. . .

JMC: I'm interested, because [UI]. What's my business about? My business is that I have Jewish people here that need cash. They will transfer to you, because they don't want to pay taxes, so they will transfer to you. What do I do? I give them the money and they make a transfer to me.

4

CS-2:      Ah! So, for example, I give you the account here and you transfer it to me into the same account?

JMC:       But you need to give me cash.

. . .

JMC:       Let's be clear, that's laundering money.

CS-1:      Of course.

CS-2:      They are corrupt people. They are politicians.

JMC:       Yes, but then they wouldn't mind [paying a higher commission for the laundering]. They should not mind to pay 15%, which is the going rate. That's how much it costs. . . .

Based on my training and experience, and my experience in this investigation, as well as on my conversations with CS-1 and CS-2, I understand that, during this conversation, CHOCRON discussed a plan to receive funds in the form of cash, representing the proceeds of corruption from a network of Brazilian politicians, and to launder those funds through a system of bank accounts controlled by CS-1 and CS-2.

      e.   Further, on or about May 13, 2019, CHOCRON, CS-1, and CS-2, during a recorded meeting in the Miami vicinity, engaged in the following conversation:

CS-2:      Look, I put there for you. . . did you put the small piece of paper in there?

CS-1:      Yes.

JMC:       The coordinates.

CS-2:      I'm giving you an account of a food company. I do not make food, but it comes up as "food products". And there is where you can put the money . . . that

5

|||
|---|---|
| | account can take a lot in.  I just want for us to start this business. |
| JMC: | No, what I want is for you to talk to these people. |
| CS-2: | I already spoke to the Brazilians and I raised it to twelve. . . |
| JMC: | Remember something… |
| CS-2: | . . . 15.  Let's close them at 15. |
| JMC: | [OV] Remember this, [CS-2], the business . . . this business of. . . |
| CS-2: | [OV] We are doing a huge favor for them. . . |
| JMC: | . . . sending transfers, we have to do it very carefully because we need, for instance, a person like [CS-1] and another person that I have, which are the people that will take care of delivering the cash. |
| . . . | |
| CS-2: | But you can't stretch yourself either. |
| JMC: | No, no, those are people who have been here for 30 years.  They are very big people, people with money.  What happens is that they have ranches.  They have businesses and they pay a lot of taxes.  So they don't pay taxes with the cash. |
| CS-1: | Sure. |
| CS-2: | That took them about 30-40 years to create that structure. |
| JMC: | No, they do it when they have a person they trust.  They don't do it with just anybody. |
| . . . | |

6

<pre>
CS-2:       Because those guys are politicians.  It's all
            corruption . . . .
</pre>

Based on my training and experience, and my experience in this investigation, as well as on my conversations with CS-1 and CS-2, I understand that, during this conversation, CHOCRON discussed, among other things, the receipt of funds and the transfer of those funds to a particular bank account to be provided by CS-1 and CS-2 (i.e., the "coordinates"). CHOCRON further explained that at least part of his ability to source currency for use in these laundering transactions is through a network of high net worth individuals who wish to hold their wealth in cash, for the purpose of avoiding income tax reporting requirements.

    f. On or about August 13, 2019, CS-1 and CS-2 introduced the UC to CHOCRON as an individual in need of CHOCRON's laundering services in connection with the movement of a large amount of cash derived from corruption and graft in Brazil. The UC was held out as a more sophisticated money launderer than either CS-1 or CS-2, interested in laundering large amounts of money belonging principally to corrupt Brazilian politicians, as discussed during previous recorded meetings between CHOCRON, CS-1 and CS-2. During the August 13, 2019, meeting, the following conversation took place:

<pre>
UC:         So, so you can understand the perspective somehow,
            it's, since, since politics has changed in Brazil with
            the new president . . .

JMC:        Uh-huh.

UC:         . . . people— the same way as in Venezuela where many
            people are desperate with the political situation
            there.  They want to take everything they have out of
            Venezuela, right?

JMC:        They had offered it to me but the thing is that I
            don't do business with people from Venezuela.

UC:         Oh, okay.

JMC:        But they had offered me Euros.
</pre>

7

UC:   Uh-huh.

JMC:  They exchange it to me, giving me 10 percent, plus getting paid even exchange rate Euros to Dollars, but I told them no. It's because I don't do business with, with assassins. I do business with delinquents but not with assassins. Do you understand me now?

UC:   Oh, yes, yes, yes. Well, if you consider the Brazilian politicians only delinquents, then we are good. [Laughs]

JMC:  I consider them only delinquents.

. . .

JMC:  We are understanding each other better now.

UC:   Uh, yes, because the thing is, imagine. . . I have big amounts in cash.

JMC:  Yes, but we're going to go slowly.

UC:   [OV] You know—you know how much the base 'tip' for a politician in Brazil would go for?

JMC:  No.

UC:   The, the minimal 'tip' towards a soccer stadium project starts at one million dollars, not less than that, and that's only one person, one politician, a *prefeito*, uh, how do you say? A major, a governor.

JMC:  [OV] Listen, this one here, the one I'm calling now. . .

UC:   [Laughs]

JMC:  . . . he has at least 1 billion dollars; this one, the one I'm calling now.

8

Based on my training and experience, and my experience in this investigation, as well as on my conversations with the UC, CS-1 and CS-2, I understand that, during this conversation, CHOCRON discussed, among other things, his willingness to engage in larger laundering transactions with the UC, again for the purpose of concealing corruption proceeds purportedly earned by high-level Brazilian politicians.

5.  Throughout the course of the interactions between CS-1 and CS-2, on the one hand, and JOSE MORELY CHOCRON, the defendant, on the other, CHOCRON facilitated multiple wire transfers associated with the proceeds of what has been represented by the CS and UC to be foreign corruption.

6.  Moreover, from my conversations with the UC, my review of transcripts of recordings of WhatsApp communications between the UC and CHOCRON, and my review of relevant bank records, I have learned that, following their initial August 13, 2019, meeting, CHOCRON agreed to, and thereafter in fact did, accept approximately $250,000, represented by the UC to be corruption proceeds. CHOCRON agreed to accept and transfer those funds back to the UC in return for an approximately 15% fee. In furtherance of that activity, the following transactions were conducted, all from, or at the direction of, CHOCRON to a bank account purportedly belonging to a "consulting" company based in Tampa, Florida. The bank account provided by the UC ("Account-1") was established and held in the Southern District of New York, and received, among others, the following incoming wire transfers:[2]

    a.  On or about August 22, 2019, Account-1 received $2,500 via electronic wire transfer. The wire transfer information provided with this transaction listed the sender as a particular individual ("Individual-1"), and the "originator to beneficiary information" or "OBI" read in part "for a 20-foot container."[3] At no time did the UC transact with CHOCRON or

---

[2] Electronic wiring instructions provided by the UC to CHOCRON expressly provide the name and address of the Manhattan-based bank at which the UC account was held.

[3] The OBI information for this August 22, 2019, transfer was provided in Spanish. Here, I provide a draft, English-language translation of that wire transfer information.

9

Individual-1 in connection with the procurement of a "container" of any dimension.

    b. Also on or about August 22, 2019, Account-1 received $7,490.00 via electronic wire transfer from a particular limited liability corporation, "Matos Brothers LLC," which, as described in more detail below, is controlled by defendant JUAN MARCOS MATOS RUIZ and used by MATOS and defendant ISAAC SCHACHTEL for the purpose of laundering funds. The OBI for this transfer read "Invoice 201907842." At no time did the UC transact with CHOCRON, MATOS, or SCHACHTEL in connection with any business involving Matos Brothers LLC, apart from the illicit laundering activity described herein.

    c. On or about August 22, 2019, Account-1 received $10,000.00 via electronic wire transfer listing the owners of the sending account as "Isaac Schachtel" and another individual ("Individual-2"). The OBI for this transfer read "Services." At no time did the UC transact with CHOCRON, SCHACHTEL, or Individual-2 in connection with any business apart from the illicit laundering activity described herein.

    d. On or about August 23, 2019, Account-1 received $8,775 via electronic wire transfer. The wire transfer information provided with this transaction listed the sender as a particular individual ("Individual-3"), and the OBI read in part "personal customs expenses."[4] At no time did the UC transact with CHOCRON or Individual-4 in connection with any customs-related activity.

    e. On or about August 27, 2019, Account-1 received $7,505.00 via electronic wire transfer from Matos Brothers LLC, belonging to MATOS. The OBI for this transfer read "Invoice 201907857." At no time did the UC transact with CHOCRON or MATOS in connection with any business involving Matos Brothers LLC, apart from the illicit laundering activity described herein.

    f. On or about September 6, 2019, Account-1 received $50,000 via electronic wire transfer. The wire transfer information provided with this transaction listed the sender as a particular individual ("Individual-4"), with no OBI.

---

[4] The OBI information for this August 23, 2019, transfer was provided in Spanish. Here, I provide a draft, English-language translation of that wire transfer information.

g. On or about September 9, 2019, Account-1 received $2,580.00 via electronic wire transfer listing SCHACHTEL and Individual-2 as the senders. The OBI for this transfer again read "Services."

h. On or about September 10, 2019, Account-1 received $10,000.00 via electronic wire transfer from a particular corporation that, from its name, appeared to be an electronics company ("Corporation-1"). The OBI for this transfer read "Services." At no time did the UC transact with CHOCRON in connection with any business involving Corporation-1, apart from the illicit laundering activity described herein.

7. Following the UC's initial interactions with JOSE MORELY CHOCRON, the defendant, CHOCRON used JUAN CARLOS BALAGUERA VILLAMIZAR, the defendant, to accept cash from the UC and to return portions of that cash to the UC's bank accounts via various laundering transfers. CHOCRON, moreover, introduced the UC to VILLAMIZAR. On or about October 10, 2019, the UC and VILLAMIZAR met in person, during which the UC directly explained the source of the funds to be laundered, and VILLAMIZAR explained his ability to conduct those laundering transactions:

UC: My people are in Brazil and need to move that money but in a reliable way.

JCBV: Look, if you need to send to Brazil, I mean, we are talking about [UI], I have that handling if you happen to need money there in Brazil.

UC: No, because they need to take out that money from Brazil.

JCBV: From Brazil to here?

UCE: Yes. Politicians.

JCBV: Ah, okay. But if you ever happen to need something over there, right?

UC: [OV] Um-huh.

JCBV: -any transaction, you can tell me and I can handle that for you.

11

| | |
|---|---|
| UC: | Do you know Brazil? |
| JCBV: | My associate is in Brazil, he is in Sao Paolo. |

. . .

| | |
|---|---|
| UC: | Okay, I am giving you here three accounts, all in New York. Uh, either one of those three is-is good. |
| JCBV: | [OV] Okay. |
| UC: | Okay? Are you going to do it in one transaction or in several ones? |
| JCBV: | One [UI] in Asia, it could be from China. |
| UC: | From China? |
| JCBV: | From China. |
| UC: | Okay. Yes. |
| JCBV: | And any information you need I will send you a report of the accounts where I will transfer you from, to send to the bank and so forth. Because it's important that you have that information. |
| UC: | Yes, yes, yes. |
| JCBV: | I mean, the transaction number, the service rendered, anything you want, we'll arrange that. |

. . .

| | |
|---|---|
| JCBV: | Okay. Either way I will keep you posted step by step. I mean, count on that, I mean, you are talking with the person who will do the processing. I mean, it's not that I will send someone to do it, no, I take care of everything, I will handle all your stuff, I take care of that. |

12

UC:        Perfect.

At this meeting, the UC provided VILLAMIZAR with a bag containing $250,000. That amount, less a laundering commission of 18%, was returned by CHOCRON and VILLAMIZAR through a series of five wire transfers, including an October 22, 2019, transfer of $65,000 from an account identified in transfer records as belonging to "Grupo Empresarial La Torre de Oro/Juan Carlos Balaguera VILLAMIZAR," held at Bancolombia.[5]

8.     Following the UC's initial interactions with JOSE MORELY CHOCRON, the defendant, the UC met ISAAC SCHACHTEL, the defendant, on or about November 5, 2019, in Manhattan, New York. SCHACHTEL introduced himself as a partner of CHOCRON's in the laundering of illicit proceeds. In the course of conversations with SCHACHTEL, the UC explained the purported illicit origin of the funds being laundered by CHOCRON and SCHACHTEL, as he had previously explained to CHOCRON. For example, on or about November 5, 2019, the UC and SCHACHTEL engaged in the following conversation:

UC:        [M]y people are corrupted politicians, imagine.

ISAAC:     Oh, good people.  I mean, they are not good people, but they are not involved in any other stuff.

UC:        They are not involved in violence, drug-trafficking. They, look, a simple "tip" there can be worth more than one million dollars and up, any tip to get a contract for a stadium or a road.

---

[5] VILLAMIZAR has continued to conduct laundering transactions with the network being investigated by the FBI, and has continued to meet with the UC in connection with that activity. On or about January 24, 2020, the UC and VILLAMIZAR met in person, at which time the UC provided an additional $150,000 to VILLAMIZAR for purposes of laundering through VILLAMIZAR's bank accounts. The UC explained regarding that $150,000: "These 150 represent a bribe, from a contract, a contract from-from-from government cars . . . from the mayor's office of . . . Cabo Frio. This is a small bribe."

ISAAC:    You mean, a contract, a signature from the politician to approve -

UC:       Yes, for money.

ISAAC:    To build a stadium, to get permits -

UCE:      Exactly.

ISAAC:    There is big money . . . . Lots of money, because in Brazil -

. . .

ISAAC:    And isn't [UI] to take it out of there to here?

UC:       No, no, we have our system to get the money out of there. We haven't had any issues to do it, but to launder that… you have to have, you know.

ISAAC:    [OV] Good people.

UC:       . . . reliable people to-to deal -

ISAAC:    [OV] That's what I told [CS-2].

During the same conversation, SCHACHTEL further explained, in substance and in part, the scope of SCHACHTEL's money laundering network, which overlaps with that operated by CHOCRON. Like CHOCRON, SCHACHTEL has a large number of individual "clients" in and around the Miami area whom he uses to source the funds necessary to launder cash delivered by those wishing to use his laundering network and money transmission service. Among other things, SCHACHTEL has referred to a pre-existing network, focused on sourcing funds through SCHACHTEL's connections in particular communities in and around Miami ("UC: [CHOCRON] explained to me that your network does not deal with that [narcotrafficking], so there is no -. SCHACHTEL: No, we deal with only people from [SCHACHTEL's] community. . . I don't have anyone weird.").

9.   In the months following the UC's initial interactions with ISAAC SCHACHTEL, the defendant, the UC has

continued to receive wire transfers of funds representing "washed" bribery proceeds from both SCHACHTEL and CHOCRON. Moreover, SCHACHTEL has offered to expand the UC's ability to launder purported bribery proceeds by introducing the UC to an additional co-conspirator: the defendant ALFREDO LICHOA.

   a. Over a series of meetings between on or about November 15, 2019, through on or about January 15, 2020, SCHACHTEL had further described the possibility of laundering the UC's funds through certain racehorse trainers located in the Miami area. During those meetings with the UC, SCHACHTEL described, in substance and in part, a system by which illicit funds could be provided to a racehorse trainer, deposited into that trainer's "horseman's account" (*i.e.*, a bank account through which the trainer makes and receives payments relating to the purchase and sale of racehorses), and laundered either through the rapid resale of a racehorse or through consistent winnings on the basis of a particular racehorses' success. SCHACHTEL further described the ability of a particular racehorse trainer, ALFREDO LICHOA, the defendant, to virtually guarantee the safety of the UC's money through LICHOA's systematic administration of illicit performance enhancing drugs to the racehorses under his control.

   b. On or about February 11, 2020, the UC, a second undercover officer ("UC-2," posing as the UC's business partner), SCHACHTEL, and LICHOA met in person to discuss the laundering plan that SCHACHTEL had previously described. At that meeting, the UC and UC-2, in substance and in part, described again the purported origin of the funds that LICHOA would take part in laundering (UC-2: "The money that we are going to invest is coming from Brazil. Some politicians friends of ours who have received some payments." LICHOA: "I understand you perfectly!"). Finally, UC-2 provided LICHOA and SCHACHTEL with $50,000 in cash, which LICHOA accepted and carried away from the meeting.

   c. On or about February 20, 2020, the UC and LICHOA met again at a racehorse training center in Florida, where LICHOA took the UC on a tour of some of LICHOA's stables. During that tour, the UC and LICHOA continued to discuss the laundering of the $50,000 previously provided by the UC and UC-2. Among other things, the UC explained to LICHOA, in part, "Those fifty [*i.e.*, the $50,000], I don't know if he [UC-2] told you that it came from a bribery of a mayor from over there [*i.e.*, Brazil]. . . . Some people wanted to put some Jet Skis in [sic] the beach over there . . . [so] they pay a bribe like that. . . those fifty came from there." Moreover, during the same meeting, LICHOA explained that, following LICHOA's

acceptance of the $50,000, on February 11, 2020, those funds were deposited into an account controlled by SCHACHTEL, from which the funds would later be transferred to LICHOA's "horseman's account" for the purpose of purchasing a racehorse in furtherance of the laundering scheme.

    10. On or about February 20, 2020, the UC and JUAN MARCOS MATOS RUIZ, the defendant, met in person following an introduction by CS-1. During that meeting, among other things, MATOS RUIZ explained, in substance, that he controlled the Matos Brothers LLC account that had assisted in laundering funds previously provided to JOSE MORELY CHOCRON, a/k/a "Pepe," and ISAAC SCHACHTEL, the defendants.[6] At that meeting, moreover, MATOS discussed his ability to continue laundering purported bribe proceeds for the UC. During that meeting, the following conversation ensued:

| | |
|---|---|
| UC: | I'm a broker. I help those politicians from Brazil. |
| MATOS: | Of course! |
| UC: | To bring their money over here and laundry their money. |
| MATOS: | Of course! |
| UC: | That is my role. |
| MATOS: | Of course! |
| UC: | They haven't had a problem in 20 years. We haven't have any type of problems. We work with honest people and . . . we already have our system. The people say, I need. . . have someone in Brazil . . . someone who can help you…I don't need that. |
| MATOS: | Uh-huh! |
| UC: | I don't need that.  I need the help here. |
| MATOS: | Here! |
| UC: | The people- the people want things— |

---

[6] On or about December 5, 2019, SCHACHTEL had described "Juan" to the UC as one of the owners of Matos Brothers LLC, "the one [i.e., the business] who had sent you many transfers."

16

| | |
|---|---|
| MATOS: | In the United States. |
| UC: | . . . These $100,000.00 that I have right now came – came – came from a bribe. I have family members, I have cousins who are marry to politicians over there in Rio de Janeiro. |
| . . . | |
| UC: | Those people mainly work at the small municipalities up north, in cities up north from Rio de Janeiro. |
| MATOS: | From Rio, okay. |
| UC: | These $100,000.00 especially for the Carnaval. The people that want to open a Jet Ski place at one of Buso's beaches. |
| MATOS: | Oh, yes. |
| UC: | Obviously, had to… |
| MATOS: | Move. |
| UC: | And-and-an that is nothing . . . $100,000.00. |
| MATOS: | That was just for the permit-that was just for the permit. |
| UC: | That was just for the permit. But $100,000.00, do you know how many American's are over there right now? |
| MATOS: | Of course! How much of a profit they get out of there, [UC]. |

On or about the following day, January 21, 2020, MATOS accepted $100,000 in cash from the UC. On the same day, MATOS laundered that amount of money, returning $85,000 (the full $100,000 minus a 15% commission) to the UC's bank accounts, including to Account-1, via two wire transfers.

WEREFORE, deponent respectfully requests that warrants be issued for the arrest of JOSE MORELY CHOCRON, a/k/a "Pepe," ISAAC SCHACHTEL, JUAN CARLOS BALAGUERA VILLAMIZAR, ALFREDO LICHOA, and JUAN MARCOS MATOS RUIZ, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

_____
Special Agent Aaron J. Otterson
Federal Bureau of Investigation

Sworn to before me this
27 day of February 2020

_____
THE HONORABLE SARAH L. CAVE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK